ORDERED.

**Dated:  January 07, 2020**

Roberta A. Colton
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
www.flmb.uscourts.gov

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| ASBEL VICIEDO, | ) | Case No.  3:18-bk-03184-JAF |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| | ) | |
| CREAL DALLAS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. No. 3:19-ap-00007-JAF |
| vs. | ) | |
| | ) | |
| ASBEL VICIEDO, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM, DECISION AND FINDINGS OF FACT**

Plaintiff Creal Dallas, LLC ("Creal") sues Defendant-Debtor Asbel Viciedo ("Debtor") objecting to the dischargeability of a debt under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6).[1] After a full day trial on November 26, 2019, and the receipt of written closing arguments on December 20, 2019, the Court finds as follows:

---

[1] Statutory references are to 11 U.S.C. § 523 ("Code" or "Bankruptcy Code"), unless otherwise stated.

Jurisdiction

Jurisdiction is proper under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

Findings of Facts

Debtor owned and operated a business called "Only Used Trucks." The corporate name of the business was Hammerhead Motors LLC ("Hammerhead").  Through Hammerhead, Debtor purchased used trucks at auction and resold the trucks at its retail locations. Hammerhead's niche market was sale of used trucks to undocumented workers who did not have a social security number.

In 2016, Creal was heavily involved in sub-prime financing through AFS Acceptance ("AFS"), a company that later merged into Creal.   AFS was impressed with Hammerhead's used truck sales to undocumented workers and saw sought an opportunity to extend sub-prime financing to these individuals by developing a relationship with Hammerhead.  Hammerhead, for its part, saw an opportunity to further exploit its niche and generate additional income by referring its customers for sub-prime financing.

Thus, in April 2016, Hammerhead and Creal/AFS decided to see if they could develop some synergies with floor plan financing and sub-prime consumer financing. At the time, Hammerhead had a $6.0 million floor plan arrangement with another lender.  Nevertheless, to further a potentially lucrative relationship with Creal, Hammerhead entered into two agreements (i) a $1.5 million floor plan financing arrangement with Creal to finance the purchase of used trucks at auction (the "Floor Plan Agreement") and (ii) an agreement with AFS to share revenues from sub-prime financing extended to Hammerhead's customers (the "Dealer Agreement").

As part of the Floor Plan Agreement, Hammerhead executed a promissory note for $1.5 million and a security interest, in favor of Creal, for vehicles purchased by Hammerhead under Floor Plan Agreement.  Debtor also personally guaranteed Hammerhead's obligations under the Floor Plan Agreement.  Significantly, this was Creal's first floor plan financing arrangement.

Under the Dealer Agreement, Hammerhead was charged with sending customer credit applications to AFS to be evaluated for sub-prime financing.[2]  If AFS agreed to provide financing, Hammerhead was entitled to a cut of the financing revenues.  But AFS retained sole discretion to determine whether to extend financing to any Hammerhead customer.

The experiment was short lived.  Because Creal was new at floor plan financing they were not registered with the auction company.  So, the first time Hammerhead went to purchase used trucks at auction under the Creal Floor Plan Agreement, the funds were not immediately available, and Hammerhead had to rely on funds from his other floor plan lender to make its cash purchases.  Creal eventually advanced $500,000 to $600,000, but as a result of the initial snafus, some of the used trucks ended up being double floor planned.  It is undisputed that Hammerhead kept the money advanced by Creal and, notwithstanding some title issues, it is not disputed that Creal had a security interest in the purchased trucks.

Because of the initial difficulties with the Floor Plan Arrangement, the parties discussed using the Dealer Agreement to pay back Creal for the funds that were not needed to purchase the used trucks at auction because they came too late.  Unfortunately, however, the relationship

---

[2] The Dealer Agreement states that all contracts were to be sent to AFS for consideration, but, at trial, the parties generally agreed that only candidates for sub-prime financing would be sent and considered by AFS.

with AFS also quickly unraveled and no sub-prime loans were ever issued under Dealer Agreement.

On June 15, 2016, Creal sent an attorneys' demand letter to Hammerhead and Debtor claiming that $513,531.40 was due under the Floor Plan Agreement. When negotiations broke down, Creal seized the vehicles identified as its collateral. Only one vehicle, a 2007 Chevy Silverado, was not located and recovered by Creal (the "Missing Truck").

Thereafter, Creal filed suit against Hammerhead and Debtor for breach of contract. A settlement was reached quickly, and Hammerhead and Debtor agreed to repay $387,934.01 to Creal (the "Settlement").[3] Hammerhead and/or Debtor paid approximately $243,000 to Creal under the Settlement before defaulting. Notwithstanding Hammerhead's partial payments, the Settlement entitled Creal to a judgment for the full $387,934.01 in the event of a default.

Discussion

Initially, Creal maintained that its judgment for $387,934.01 is non-dischargeable under section 523(a)(2)(A)).[4] After trial, Creal argued, in the alternative, that it is entitled to a non-dischargeability judgment just for those payments not made under the Settlement.

Section 523(a)(2)(A) excepts from discharge debts for money obtained by "false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor and or an insider's financial condition." Creal argues that Debtor fraudulently induced Creal into to Floor Plan Agreement and never intended to repay the funds advanced by Creal. Debtor argues that the relationship with Creal was simply a business transaction gone bad.

---

[3] Compl. at ¶¶ 17-18; Doc. 27-7
[4] 11 U.S.C. § 523(a)(2)(A)

Creal' Complaint also alleges that the its judgment is non-dischargeable under section 523(a)(6) and/or that the loss of the Missing Truck was a willful and malicious collateral conversion that is non-dischargeable under the same statutory provision.  Section 23(a)(6) excepts from discharge debts from discharge "for willful and malicious injury by the debtor to another entity or the property of another entity."[5]

## Burden of Proof

Creditors seeking an exception to discharge under section 523 bear the burden of proof and must establish their claims by preponderance of the evidence.[6]   In addition, exceptions to discharge are construed narrowly to ensure that the "honest but unfortunate debtor" is afforded a fresh start.[7] The reasons for denying a discharge ... "must be real and substantial, not merely technical and conjectural."[8]

## Section 523 (a)(2)(A)

To establish its claim under § 523(a)(2)(A), Creal  must prove that, at the time the promise was made, Debtor knew that he could not fulfill the promise or had no intention of fulfilling the promise.[9] As the  Eleventh Circuit Court explains:

> Courts have generally interpreted § 523(a)(2)(A) to require the traditional elements of common law fraud. A creditor must prove that: (1) the debtor made a false representation to deceive the creditor, (2) the creditor relied on the

---

[5] 11 U.S.C. § 523(a)(6)

[6] *In re Miller*, 39 F.3d 301, 304 (11th Cir. 1994) quoting *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); see also *In re Soderstrom*, 524 B.R. 835 (Bankr. M.D. Fla. 2015)

[7] *Birmingham Trust Nat'l Bank v. Case*, 755 F.2d 1474, 1477 (11th Cir.1985); see also *Caspers v. Van Horne*, 823 F.2d 1285, 1287 (8th Cir.1987) ("[E]vidence presented must be viewed consistent with congressional intent that exceptions to discharge be narrowly construed against the creditor and liberally against the debtor, thus effectuating the fresh start policy of the Code.")

[8] *In re Miller*, 39 F.3d at 304; *see also In re Moore*, 508 B.R. 488, 494 (Bankr. M.D. Fla. 2014), aff'd, 619 F. App'x 951 (11th Cir. 2015)(stating "like objections to discharge, exceptions to the dischargeability of a particular debt are also strictly construed in favor of the debtor").

[9] *In re Monson*, 661 F. App'x 675, 680 (11th Cir. 2016)

misrepresentation, (3) the reliance was justified, and (4) the creditor sustained a loss as a result of the misrepresentation.[10]

To except a debt from discharge under section 523(a)(2)(A), the false representations giving rise to the debt must have been knowingly and fraudulently made.[11] It is also necessary that the other party relied on the representation.[12] A misrepresentation by a debtor of his or her intention to perform contractual duties may be a false representation under section 523(a)(2)(A). Intent not to perform may be inferred from the fact that the debtor failed to take any steps to perform under the contract.[13]

There are three ways to establish fraud under 523(a)(2)(A) false pretenses, false representations, or actual fraud. False pretenses is broadly construed:

> The concept of false pretenses is especially broad. It includes any intentional fraud or deceit practiced by whatever method in whatever manner. False pretenses may be implied from conduct or may consist of concealment or non-disclosure where there is a duty to speak, and may consist of any acts, work, symbol, or token calculated and intended to deceive.[14]

A "false representation" under the statute may be "demonstrated through conduct, and a spoken or written statement is not required."[15] Actual fraud is "deception or trickery committed with wrongful intent."[16] A plaintiff is induced to enter into a contract when the defendant makes a knowingly false representation to the plaintiff, and the plaintiff relies on such statements when entering into the contract.[17]

---

[10] *In re Bilzerian*, 153 F.3d 1278, 1281 (11th Cir.1998).

[11] 4 Collier on Bankruptcy ¶ 523.08[l][d], at 523–44.9; *In re Shusteric*, 380 B.R. 58, 65 (Bankr. M.D. Fla. 2007)

[12] 4 Collier on Bankruptcy ¶ 523.08[l][d], at 523–44.9

[13] *Jokay Co. v. Mercado (In re Mercado)*, 27 C.B.C.2d 1356, 144 B.R. 879 (Bankr. C.D. Fla. 1992);

[14] *Holland Builders, Inc. v. Lloyd (In re Lloyd)*, 549 B.R. 282, 292 (Bankr. M.D. Fla. 2016) (quoting *Taylor v. Wood (In re Wood)*, 245 F. App'x 916, 918 (11th Cir. 2007))(emphasis added)

[15] *In re Zaidel*, 553 B.R. 655, 663 (Bankr. E.D. Wis. 2016)

[16] *In re Utter*, 2017 WL 1091875, at *3 (Bankr. M.D. Fla. Mar. 22, 2017) (*citing Husky Int'l Electronics, Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016)).

[17] *In re McClain*, 138 B.R. 294, 297 (Bankr. M.D. Fla. 1992)(finding plaintiff knowingly misrepresented the worth and potential of a distributorship to induce defendants to enter into a contract).

Here, the evidence of Mr. Viciedo's alleged fraudulent inducement or false pretenses under § 523(a)(2)(A) is his failure to promptly return the cash advanced by Creal under the Floor Plan Agreement.[18] This retention of funds obviously occurred after the Floor Plan Agreement was executed and after the logistical problem of Creal's inability to deal directly with the auction company became apparent.  Hammerhead's failure to return the funds immediately also may be reasonably explained by subsequent discussions to to repay the floor plan advances by set offs against amounts to come due to Hammerhead under the Dealer Agreement.

Further evidence supports Debtor's argument that the Floor Plan Agreement was simply a bad business deal.  Hammerhead entered into the Floor Plan Agreement with Creal to make money on the Dealer Agreement with AFS.   Creal's main focus (through AFS) was to obtain access to Hammerhead's customers for sub-prime financing.  Credible testimony reflected a sincere desire by both parties to advance the business relationship and to make the arrangement work at the onset. The relatively small floor plan arrangement (in comparison to Hammerheads arrangements with his primary lender) was an experiment, but had the promise of enhancing a potentially lucrative relationship.

Even events after the fact demonstrate Debtor's original intent was to perform under the Floor Plan Agreement.  Other than the Missing Truck, Creal was able to repossess the secured vehicles.  Although the repossession may have occurred under the cover of night, no evidence suggested that Hammerhead or Debtor interfered with that process.  It is also telling that

---

[18] Creal also argues that no sub prime financing was extended under the Dealer Agreement.  But Creal/AFS does not assert any breach of the Dealer Agreement.  Moreover, evidence was presented that at least a few applications were sent to AFAS for consideration. None were accepted by AFS and the applications may not have been completed before the relationship soured.

Hammerhead and Debtor quickly resolved the breach of contract litigation and made substantial payments to Creal under the Settlement.

In light of all of the circumstances, Creal failed to meet its burden of proving a fraudulent inducement. On the other hand, there is ample evidence that the arrangement was simply an ill-conceived business relationship that mercifully ended quickly. In entering into the Floor Plan Agreement (as opposed to the Dealer Agreement), Creal was new to the game and may have fallen short in its due diligence of Hammerhead's finances and liquidity, instead relying too much on the personal relationship between Debtor and one of the officers of AFS. Accordingly, the Court will enter judgment for Debtor on Creal's section 523(a)(2)(A) claim.

## Section 523(a)(6)

To establish a nondischargeable debt under § 523(a)(6), the debt must be the result both willful and malicious injury.[19] A debtor is "responsible for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury."[20] The term "malicious" is defined as "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will."[21] The "mere failure to abide by contractual obligations is not sufficient to sustain an exception to discharge" under §

---

[19] Courts frequently mesh the separate requirements of willfulness and maliciousness into a single inquiry. This is incorrect. As one court of appeals observed: "Congress tells us in § 523(a)(6) that malice and willfulness are two different characteristics. They should not be lumped together to create an amorphous standard to prevent discharge for any conduct that may be judicially considered to be deplorable." *In re Long,* 774 F.2d 875, 881 (8th Cir.1985)

[20] *In re Thomas,* 288 Fed. Appx. 547, 549 (11th Cir. 2008)(unpublished)

[21] *Lee v. Ikner (In re Ikner),* 883 F.2d 986, 991 (11th Cir.1989)(*quoting Sunco Sales, Inc. v. Latch (In re Latch),* 820 F.2d 1163, 1166 n. 4 (11th Cir.1987)).

523(a)(6).[22] When financial harms are alleged, it must be shown that the debtor "actually knew, at the time of the intentional act, that injury was substantially certain to result."[23]

To the extent that Creal's complaint lumps all of its allegations into one count, Creal failed to prove that its breach of contract deficiency judgment was the result of a willful and malicious injury. Instead, at trial, Creal focused on its willful conversion of collateral claim for the Missing Truck.

Conversion of collateral can be a willful and malicious injury under the Bankruptcy Code. For example in, *In re Monson*, the Eleventh Circuit held a debt arising out of a Chapter 7 debtor's unauthorized removal of computer equipment subject to the creditor's security interest was non-dischargeable in bankruptcy as debt for debtor's willful and malicious injury under 523(a)(6).[24] The debtor's actions in absconding with the equipment known to be held by a security interest was found to be a willful and malicious injury. The Eleventh Circuit in *Monson* recognized that

> Bankruptcy courts within this Circuit have held that, whether or not a lienholder's security interest is properly perfected or recorded, where the debtor has knowledge of the lienholder's claim and subsequently sells or disposes of the property at issue without notice to the lienholder, that act constitutes a willful and malicious injury under § 523(a)(6).[25]

Bankruptcy courts also have held that an individual debtor who, as an officer of a corporation, actively participates in the conversion of collateral, is personally liable to the

---

[22] *In re Gelinas*, No. 05-36668-BKC-PGH, 2008 WL 5640701, at *6 (Bankr. S.D. Fla. Nov. 12, 2008)(quoting *Calumet v. Whiters (In re Whiters)*, 337 B.R. 326, 339 (Bankr.N.D.Ind.2006)); *see also Lockerby v. Sierra*, 535 F.3d 1038 (9th Cir. Aug. 7, 2008)("[I]n breach of contract cases, 'something more' is necessary to exempt a debt from discharge—tortious conduct")).

[23] *Petroleum Realty I, LLC v. McCravy (In re McCravy)*, 2015 WL 3916811, at *9 (Bankr. S.D. Fla. 2015); *Kane v. Stewart Tilghman Fox & Bianchi Pa (In re Kane)*, 755 F.3d 1285, 1293 (11th Cir. 2014).

[24] *In re Monson*, 661 F. App'x 675 (11th Cir. 2016)

[25] *In re Monson* 661 F. App'x at 684; *see also Chrysler Credit Corp. v. Rebhan*, 842 F.2d 1257 (11th Cir. 1988) (corporate officer who personally guaranteed corporate borrower's debt and then converted collateral committed willful and malicious injury); *Ford Motor Credit Co. v. Owens*, 807 F.2d 1556 (11th Cir. 1987) (same).

injured party and the debt is non-dischargeable pursuant to § 523(a)(6).[26] In *Owens*, the debtor

was an officer, director, and majority shareholder of an automobile corporation and personally

guaranteed a debt similar for floor financing. The *Owens* debtor "was in charge of the day-to-

day activities, sold automobiles without remitting the proceeds to [the Creditor], and transferred

money from the dealership to another corporation he (the debtor) owned while failing to make

any notation on the records."[27] The court found "an officer of a corporation acts willfully if he

is in control of the actions taken by the business, and "maliciously" if he is aware that these

actions taken violate the property rights of another."[28]

Applying these standards, Debtor was responsible for the day to day activities of the

Hammerhead's used truck sales and operations.[29]   Debtor also knew the Missing Truck was

subject to Creal's lien, and Debtor (acting through Hammerhead) accepted the money from

Creal under the Floor Plan Agreement.  The glaring hole in Creal's case, however, is that no

evidence was presented that the Missing Truck was ever on Hammerhead's lot or that

Hammerhead or Debtor sold the Missing Truck and kept the money.  The only testimony related

to the Missing Truck was Creal's final witness who testified that the Missing Truck simply was

not on the lot.

In addition, at best, Creal's claim for willful and malicious collateral conversion is

limited to the value of the Missing Truck.[30]  But, after repossessing all of its collateral except

the Missing Truck, Hammerhead actually paid Creal approximately $243,000 under the

---

[26] *Ford Motor Credit Co. v. Owens*, 807 F.2d at 1559
[27] *In re Penton*, 299 B.R. 701, 705 (Bankr. S.D. Ga. 2003)(summarizing *Owens*)
[28] *Id.*
[29] "[A] business person will be held to a higher standard than an ordinary individual where it is clear that the business person would be more knowledgeable of the natural consequences of his acts." *Id.* at 705
[30] *See, e.g., In re Reid,* 598 B.R. 674, 684 (Bankr. S.D. Ala. 2019).

Settlement.  So, on this record, even if Creal had established a viable claim for conversion of the Missing Truck, who is to say that Creal's conversion claim has not already been satisfied.

Accordingly, Creal also has not met its burden in establishing a claim for non-dischargeability under section 523(a)(6).[31]

Based on these findings, Debtor's remaining obligation to Creal is subject to discharge and separate judgment will be entered in favor of the Debtor/Defendant.

Service of this Order other than by CM/ECF is not required. Local Rule 9013-3(b).

---

[31] The evidence presented by Creal stands in sharp contrast to what happened in *In re Reid*, 598 B.R. at 684. There, the evidence established that debtor sold a piece of collateral and used the money to bail out her boyfriend from jail.  The debtor also testified that she understood that selling the collateral and keeping the money would harm her creditor. No similar evidence was presented by Creal.